In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1044 & 00-1046

Russell Bridenbaugh, et al.,

Plaintiffs-Appellees,

v.

Karen Freeman-Wilson, Attorney General
of Indiana, et al.,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:98cv0464AS--Allen Sharp, Judge.

Argued June 8, 2000--Decided September 13, 2000

Before Easterbrook and Williams, Circuit Judges.

Easterbrook, Circuit Judge.  This case pits the twenty-first amendment, which appears in the Constitution, against the "dormant commerce clause," which does not. Section 2 of the twenty-first amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." This directly authorizes state control over imports, while the premise of dormant commerce clause jurisprudence is an inference that the grant of power to Congress in Art. I sec.8 cl. 3 implies a limitation on state authority over the same subject. We must decide how the combination of express grant and implied withdrawal of state power applies to I.C. sec.7.1-5-11-1.5(a), which makes unlawful all direct shipments from out of state to Indiana consumers by any "person in the business of selling alcoholic beverages in another state or country". Several Indiana enophiles brought suit, arguing that because the statute restricts only those sellers engaged in selling "in another state or country", it runs afoul of the dormant commerce clause. The district court held sec.7.1-5-11-1.5 unconstitutional, 78 F. Supp. 2d 828 (N.D. Ind. 1999), and the state officials responsible for enforcing that statute (sued on the theory of Ex

parte Young, 209 U.S. 123 (1908)), joined by intervening defendant Wine & Spirit Wholesalers of Indiana, now appeal.

Before taking up the merits, we must first decide whether the plaintiffs have standing. Indiana (as we call the state defendants) points out that the only law plaintiffs challenge regulates sellers, not consumers. Section 7.1-5-11-1.5 provides:

(a)  It is unlawful for a person in the business of selling alcoholic beverages in another state or country to ship or cause to be shipped an alcoholic beverage directly to an Indiana resident who does not hold a valid wholesaler permit under this title. This includes the ordering and selling of alcoholic beverages over a computer network (as defined by IC 35-43-2-3 (a)).

(b)  Upon a determination by the commission that a person has violated subsection (a), a wholesaler may not accept a shipment of alcoholic beverages from the person for a period of up to one (1) year as determined by the commission.

Plaintiffs are not "in the business of selling alcoholic beverages" and therefore could not violate sec.7.1-5-11-1.5(a) if they tried. Indiana contends that the only proper plaintiffs are out-of-state sellers, none of which has sued. Consumers might be able to invoke the interests of third parties if the targets of the statute would have difficulty vindicating their own rights, see Craig v. Boren, 429 U.S. 190, 192-94 (1976), but enterprises in the liquor business could challenge Indiana law without impediment. Moreover, Indiana observes, other laws do target the consumer side of transactions with unauthorized sellers, and plaintiffs have chosen not to challenge those. See I.C. sec.sec. 7.1-5-10-5, 7.1-5-10-7. As Indiana sees things, sec.7.1-5-11-1.5 causes these plaintiffs no redressable harm, because, even if it is invalid, other laws that are not subject to any plausible constitutional challenge still would prevent plaintiffs from receiving the beverages they crave from out-of-state sellers.

Let us start with injury in fact. Before Indiana enacted sec.7.1-5-11-1.5 many vintners shipped wine direct to the plaintiffs from California and other states, and they stopped as soon as sec.7.1-5-11-1.5 took effect. Some of the wines plaintiffs want to drink are not carried by Indiana resellers. That establishes injury in fact. Anyone who has held a bottle of Grange Hermitage in one hand and a broken corkscrew in the other knows this to be a palpable injury.

Moreover, Indiana dealers collect state excise taxes on wines that pass through their hands, while the shippers with which plaintiffs used to deal do not; this difference in price is another source of injury. Plaintiffs need not be the immediate target of a statute to challenge it. See Allen v. Wright, 468 U.S. 737, 758 (1984); Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992). Plaintiffs' claim, moreover, is direct rather than derivative: every interstate sale has two parties, and entitlement to transact in alcoholic beverages across state lines is as much a constitutional right of consumers as it is of shippers--if it is a constitutional right at all.

Redressability is trickier. Plaintiffs wish to purchase wine directly from out-of-state sellers. These vendors do not have Indiana permits, yet Indiana makes holding a permit a condition to the sale of liquor to its residents. I.C. sec.sec. 7.1-3-21-3, 7.1-3-21-5. (It is questionable whether out-of-state businesses are eligible for permits, but what matters now is that the sellers neither hold nor want permits, and plaintiffs have conceded that they would lack standing to challenge sec.sec. 7.1-3-21-3 and 7.1-3-21-5.) Purchasing alcoholic beverages from a vendor that the consumer knows to be unlicensed by Indiana is not only a civil infraction, I.C. sec.7.1-5-10-7, but also a criminal misdemeanor, I.C. sec.sec. 7.1-5-10-5, 7.1-5-1-8. So the purchases these plaintiffs wish to make are unlawful, under statutes that they do not challenge. How, then, could a declaration that sec.7.1-5-11-1.5 is invalid solve their problem?

At oral argument, plaintiffs' counsel insisted that the unchallenged sections are ambiguous, and that his clients could continue to order wine from out-of-state sellers without violating state law. That is untenable; the statutes we have cited are plain, and plaintiffs have filed affidavits demonstrating not only purchases from unlicensed sellers but also knowledge that the sellers lack Indiana permits. Their objective in this suit is to get rid of sec.7.1-5-11-1.5 so they can get back to violating sec.sec. 7.1-5-10-5 and 7.1-5-10-7. Laws forbidding purchases from sellers that lack Indiana permits are devilishly difficult to enforce, however, for the same reason states have insuperable problems collecting their use taxes when people buy from out-of-state vendors that do not collect sales taxes. Noncompliance is almost impossible to detect, and rampant civil disobedience ensures that a handful of prosecutions would not be effective. Private gains from violating the laws vastly exceed the anticipated legal penalties. Sellers and shippers of alcohol are fewer in number, facilitating enforcement. What is

puzzling is that Indiana appears unwilling to enforce its purchaser-side laws even against consumers who proclaim and revel in their violations, as our plaintiffs do. When a state has two statutes, one effective and one ineffective, the existence of the second cannot preclude a challenge to the first, for an injunction against the first would redress the injury. See Larson v. Valente, 456 U.S. 228, 239-40 (1982). Imagine that sec.A punished importing California wine with a $50 fine, while sec.B punished the same deed with imprisonment. Potential customers would have standing to challenge sec.B even though sec.A remained on the books, because sec.A would have much less effect on their conduct. This would be clear if the $50 were called a tax; it is equally so if the $50 is called a fine. Likewise, Indiana's unwillingness to enforce laws penalizing consumers who buy from unlicensed sellers means that plaintiffs have standing to challenge sec.7.1-5-11-1.5(a), because it is the latter section alone that effectively blocks their purchases, which will resume if sec.7.1-5-11-1.5(a) is held invalid. Plaintiffs therefore have standing. Whether it would be sound to issue an injunction designed to help scofflaws violate state statutes is doubtful, but the proper use of equitable discretion is unrelated to the requirements of Article III. Indiana does not contend that a judge should deny relief even if sec.7.1-5-11-1.5(a) is unconstitutional, so we turn to the merits.

Title 7.1 of the Indiana Code establishes an elaborate regulatory regime for the distribution of alcohol. Like most states, Indiana has chosen a three-tiered system of alcohol distribution, with different classes of permits for manufacturers, distributors, and retailers. This facilitates what appellants call "orderly market conditions"--a euphemism for reducing competition and facilitating tax collection. Direct shipments from other states undermine both of these objectives. If the product were cheese rather than wine, Indiana would not be able either to close its borders to imports or to insist that the shippers collect its taxes, despite the effect on its treasury, e.g., Quill Corp. v. North Dakota, 504 U.S. 298 (1992), though it might be able to enforce its preferred system of distribution in other ways. See, e.g., Exxon Corp. v. Governor of Maryland, 437 U.S. 117 (1978). For more than a century the Supreme Court has treated the grant of commerce power to Congress as a prohibition against border-closing laws and other efforts by states to discriminate against interstate commerce. See, e.g., Cooley v. Board of Port Wardens, 53 U.S. (12 How.) 299, 319 (1851); Welton v. Missouri, 91 U.S. 275, 280

(1875); General Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997). Indiana permits local wineries, but not wineries "in the business of selling . . . in another state or country", to ship directly to Indiana consumers. The district court concluded that this violates the Constitution. But sec.2 of the twenty-first amendment empowers Indiana to control alcohol in ways that it cannot control cheese. Does sec.2 shield sec.7.1-5-11-1.5(a) from what would otherwise be its fate under dormant commerce clause jurisprudence?

The parties believe that we should address this question by exploring the "core purposes" of sec.2. Plaintiffs, fortified chiefly by district court cases and a student note, Alcohol Direct Shipment Laws, the Commerce Clause, and the Twenty-First Amendment, 85 Va. L. Rev. 353 (1999), insist that the "core concern" of the twenty-first amendment is temperance. After Prohibition, a state that wanted to remain dry could use sec.2 to do so. But sec.7.1-5-11-1.5(a) is hard to justify as a temperance measure-- though tax collection does raise the price and thus depress the consumption of any product--and it was on this ground that the district court held that sec.2 does not authorize Indiana's law. Defendants argue that, although temperance is a "core concern," there are others, including raising revenue and "ensuring orderly market conditions." See, e.g., North Dakota v. United States, 495 U.S. 423, 432 (1990) (plurality opinion); Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 47-48 (1966), overruled on other grounds by Healy v. The Beer Institute, 491 U.S. 324, 342-43 (1989). Section 7.1-5-11-1.5(a) furthers these other objectives, so, according to defendants, the section is authorized by the twenty-first amendment. If "core concerns" spelled the difference, we would follow the Supreme Court rather than district courts and student notes. But our guide is the text and history of the Constitution, not the "purposes" or "concerns" that may or may not have animated its drafters. Objective indicators supply the context for sec.2; suppositions about mental processes are unilluminating.

Before the eighteenth amendment and the Volstead Act banned alcohol nationwide, the temperance battle was fought state by state. The movement won victories in many legislatures, and the Court held that state laws banning the production and consumption of alcohol were constitutional, Mugler v. Kansas, 123 U.S. 623 (1887), but to enforce these laws states had to deal with liquor arriving from other states and nations--and their ability to do so was regularly defeated by decisions invoking the commerce clause. See generally Owen M. Fiss, Troubled Beginnings of

the Modern State, 1888-1910, VIII Holmes Devise History of the Supreme Court 266-92 (1993); Alexander M. Bickel, The Judiciary and Responsible Government, 1910-21, IX Holmes Devise History of the Supreme Court 438-46 (1984). For example, when Iowa attempted to restrict importation of liquor to persons possessing a permit, the Court held this law an impermissible burden on interstate commerce. Bowman v. Chicago & Northwestern Ry., 125 U.S. 465 (1888). When Iowa reacted to Bowman by forbidding the sale of alcohol altogether, no matter its source, it was frustrated once again. Leisy v. Hardin, 135 U.S. 100 (1890), held that resale is incident to importation, so that imported liquor remains an article of interstate commerce--which states could not regulate--as long as it stays in its original package. See also Brown v. Maryland, 25 U.S. (12 Wheat) 419, 441-42 (1827). (The original-package doctrine has been jettisoned, see Michelin Tire Corp. v. Wages, 423 U.S. 276 (1976), but it remains vital to understanding the twenty-first amendment.) The combination of Leisy and Mugler meant that states could forbid domestic production of alcoholic beverages but could not stop imports; the Constitution effectively favored out-of-state sellers.

Leisy invited Congress to eliminate this anomaly, see 135 U.S. at 108, and Congress took up the invitation. The Wilson Act, 26 Stat. 313 (1890), empowered states to regulate imported liquor "to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." This Act eliminated the privileged status of interstate sellers but did not authorize discrimination against them. See Scott v. Donald, 165 U.S. 58 (1897). It reversed the result of Leisy and empowered states to regulate the sale of all liquor, imported or domestic. But one problem remained: shipments direct from out-of-state sellers to consumers. In re Rahrer, 140 U.S. 545 (1891), held that Congress may authorize state laws regulating liquor imports, but the Court construed the Wilson Act in light of dormant-commerce-clause jurisprudence to leave Bowman untouched, so that although states could regulate resale of imported liquor in its original package, states were still powerless against interstate shipments direct to consumers. See Rhodes v. Iowa, 170 U.S. 412 (1898); Vance v. W.A. Vandercook Co., 170 U.S. 438, 452 (1898).

Could Congress empower states to create non-uniform rules governing direct shipments, like the statute challenged in this case? Rhodes and Vance implied a negative answer--that Congress

could not "delegate" its commerce power to the states, see Cooley, 53 U.S. at 318--leading the national government to exercise national power by piggybacking state prohibitions onto a federal prohibition: "[T]he shipment or transportation [into a state] . . . of any . . . liquor . . . [which] is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State . . . is hereby prohibited." By the time this law, the Webb-Kenyon Act, 37 Stat. 699 (1913), was held constitutional by Clark Distilling Co. v. Western Maryland Ry., 242 U.S. 311 (1917), the temperance movement had the upper hand and the eighteenth amendment was soon ratified.

America changed course in 1933 and repealed the eighteenth amendment by sec.1 of the twenty-first. But the twenty-first amendment did not return the Constitution to its pre-1919 form. Section 2 tracks the Webb-Kenyon Act and effectively incorporates its approach into the Constitution. Like the Webb-Kenyon Act, sec.2 incorporates state prohibitions into a federal rule; like the Webb-Kenyon Act, sec.2 closes the loophole left by the dormant commerce clause, abetted by Bowman and Rhodes: direct shipments from out-of-state sellers to consumers that bypass state regulatory (and tax) systems. No longer may the dormant commerce clause be read to protect interstate shipments of liquor from regulation; sec.2 speaks directly to these shipments. Indeed, all "importation" involves shipments from another state or nation. Every use of sec.2 could be called "discriminatory" in the sense that plaintiffs use that term, because every statute limiting importation leaves intrastate commerce unaffected. If that were the sort of discrimination that lies outside state power, then sec.2 would be a dead letter.

No decision of the Supreme Court holds or implies that laws limited to the importation of liquor are problematic under the dormant commerce clause. What the Court has held, however, is that the greater power to forbid imports does not imply a lesser power to allow imports on discriminatory terms. See Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 579 (1986). Immediately after the amendment's ratification the Supreme Court tolerated discriminatory regulation, see California Board of Equalization v. Young's Market Co., 299 U.S. 59 (1936); Indianapolis Brewing Co. v. Liquor Control Commission, 305 U.S. 391, 394 (1939), but more recently the Court held a discriminatory tax invalid. See Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 267 (1984)

("The central purpose of [sec.2] was not to empower States to favor local liquor industries by erecting barriers to competition."). Cases such as Brown-Forman and Bacchus apply an unconstitutional-conditions approach to use of the sec.2 power. They treat sec.2 as eliminating economic discrimination against in-state commerce of the sort caused by Leisy, Bowman, and the original package doctrine, without authorizing discrimination against out-of-state sellers. Like the Wilson Act and the Webb-Kenyon Act before Prohibition, sec.2 enables a state to do to importation of liquor--including direct deliveries to consumers in original packages-- what it chooses to do to internal sales of liquor, but nothing more.

Indiana Code sec.7.1-5-11-1.5(a), like the statute in Bowman, regulates importation. And the shipments it regulates, direct shipments to consumers, are precisely the sort that prompted the Webb-Kenyon Act, the forefather of sec.2. Section 2 thus authorizes I.C. sec.7.1-5-11-1.5(a) unless the state has used its power to impose a discriminatory condition on importation, one that favors Indiana sources of alcoholic beverages over sources in other states, as Hawaii did in Bacchus. Plaintiffs contend that sec.7.1-5-11-1.5(a) discriminates in this fashion, but we do not see how. Indiana insists that every drop of liquor pass through its three-tiered system and be subjected to taxation. Wine originating in California, France, Australia, or Indiana passes through the same three tiers and is subjected to the same taxes. Where's the functional discrimination? Plaintiffs observe that holders of Indiana wine wholesaler or retailer permits may deliver directly to consumers' homes. See sec.sec.7.1-3-13-3(a), 7.1-3-14-4(c). But these permit holders may deliver California and Indiana wines alike; firms that do not hold permits may not deliver wine from either (or any) source; and even an Indiana citizen that is "in the business of selling alcoholic beverages in another state or country" is forbidden by sec.7.1-5-11-1.5(a) to deliver wine directly from out of state to a consumer in Indiana, no matter the wine's source. (An Indiana citizen holding an Indiana permit may not, for example, make direct deliveries of Indiana's, or any other state's, wines from a warehouse in Illinois. The wine must be reimported through an Indiana wholesaler or retailer.)

This regime has its anomalies. An Indiana wine retailer, holding an appropriate permit, that is also "in the business of selling alcoholic beverages" in Illinois, is permitted to ship directly to Indiana consumers by sec.7.1-3-14-4(c), and forbidden to do so by sec.7.1-5-11-1.5.

Indiana's judiciary has yet to consider how, if at all, these statutes may be reconciled. Nor need we try to do so. Though this conflict may bedevil wholesalers and retailers, plaintiffs are consumers, and the statutory conflict does not disable any wholesaler from importing liquor to Indiana and reselling to consumers. Plaintiffs do not complain about the statute that apparently limits distribution permits to Indiana's citizens. These plaintiffs are concerned only with direct shipments from out-of-state sellers who lack and do not want Indiana permits.

So far as these plaintiffs are concerned, the main effect of Indiana's system is to subject their purchases to taxation, by requiring the beverages to pass through the hands of permit holders whose business is closely monitored to ensure tax collection. Sellers that quit shipping to plaintiffs after sec.7.1-5-11-1.5 took effect have admitted in affidavits that they never paid a dollar of Indiana excise taxes. This situation resembles that created by Bowman, Leisy, Rhodes, Vance, and the original package doctrine a century ago, when states discriminated against in-state sellers, because they could not effectively govern direct shipments from elsewhere. Congress adopted the Webb-Kenyon Act, and later proposed sec.2 of the twenty-first amendment, precisely to remedy this reverse discrimination and make alcohol from every source equally amenable to state regulation. Section 7.1-5-11-1.5 has one real economic effect on out-of-state sellers who neither have nor seek Indiana permits: it channels their sales through Indiana permit-holders, enabling Indiana to collect its excise tax equally from in-state and out-of-state sellers. As the history of the twenty-first amendment confirms, this is precisely what sec.2 is for.

The judgment is reversed, and the case is remanded with instructions to enter judgment for defendants.