**[PUBLISH]**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

No. 01-14688

D.C. Docket No. 99-02681-CV-T-27

JERRY BAINBRIDGE, FAYE BAINBRIDGE,
GENE BRETOI, BETTY E. MILLINNIX-BRETOI, et. al.,

Plaintiffs-Appellants,

versus

RICHARD E. TURNER, Director of the Florida
Division of Alcoholic Beverages and Tobacco
of the Department of Professional and Business Regulation,

Defendants-Appellees,

WINE & SPIRITS DISTRIBUTORS OF FLORIDA, INC.,
FLORIDA BEER WHOLESALERS ASSOCIATION, INC.,
BEER INDUSTRY OF FLORIDA, INC.,
INDEPENDENT BEVERAGE DEALERS, INC.,

Movants-Appellants.

Appeal from the United States District Court
for the Middle District of Florida

(November 4, 2002)

Before TJOFLAT, RONEY and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

This case implicates the tension between the "dormant" aspect of the Commerce Clause[1] and the Twenty-first Amendment.[2] The primary question in this appeal is whether the State of Florida may prohibit out-of-state wineries from shipping their products directly to Florida consumers while permitting in-state wineries to do so. Appellants, who are wine consumers and out-of-state wineries, contend that Florida's statutory scheme violates the Commerce Clause of the U.S. Constitution. The State[3] counters that its action, whether in violation of the Commerce Clause or not, is permitted under the Twenty-first Amendment. The

_____

[1]    U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have the Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . .").

[2]    U.S. CONST. amend. XXI, § 2 ("The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.").

[3]    The plaintiffs sought to enjoin the following defendants from enforcing Florida's direct-shipment prohibition: Governor John Bush, Attorney General Robert A. Butterworth, and Joseph Martinelli, Director of the Division of Alcoholic Beverages and Tobacco ("DABT"). The district court granted motions to dismiss by Governor Bush and Attorney General Butterworth on the grounds that they were not proper defendants, but denied the motion to dismiss against Joseph Martinelli. The parties do not appeal this ruling. Shortly thereafter, Richard E. Turner succeeded Joseph Martinelli as DABT Director, and was substituted as the defendant, to whom we refer herein as "the State."
    After the complaint was filed, four alcoholic beverage trade associations filed timely motions to intervene. The district court denied their motion on the ground that the State adequately represented their interests, and it granted them *amicus curiae* status instead. A panel of this court affirmed on April 10, 2001. After the State and the plaintiffs filed a Joint Stipulation of Facts, the trade associations renewed their motion to intervene. The district court again denied the motion – this time because the issue was rendered moot by the court's judgment in favor of the State.

2

State is partly correct. If the subject of Florida's regulatory scheme were an ordinary widget (rather than liquor), the statutes would violate the Commerce Clause. But if the State demonstrates that its statutory scheme is closely related to a core concern of the Twenty-first Amendment and not a pretext for mere protectionism, Florida's statutes can be upheld. We ultimately conclude that the factual record is too incomplete to uphold a judgment as a matter of law for the State,[4] and so we vacate the summary judgment granted by the district court.

## I.

Like many states, Florida has instituted an elaborate system to regulate the manufacture and sale of alcohol within its borders. The regulatory framework establishes what is known as a "three-tier" distribution system – in essence a vertical quarantine. First, it requires three vertical layers of distribution (manufacturer, distributor, and vendor) and mandates that no layer in the vertical hierarchy act in the capacity of another. FLA. STAT. ANN. § 561.22(1) (West 2002). For example, a manufacturer cannot act as a distributor or retailer. Second, it allows only the last link in the vertical chain, the vendor, the ability to sell directly to consumers. Id. § 561.14(3). An exception to the vertical quarantine is carved out for in-state wineries, which are allowed to receive vendors' permits. Id. §

---

[4]    The parties filed a Joint Stipulation of Fact for Cross-Motions for Summary Judgment on May 25, 2001.

561.221(1)(a). Vendors, whether a typical retailer or a vertically integrated winery/retailer, are allowed to ship directly to consumers so long as the vendor uses vehicles that it owns or leases. Id. § 561.57(2). In no event, however, can a vendor ship to consumers by common carrier.[5] In sum, in-state wineries can obtain a vendor's license, enabling them to either sell wine on their premises or ship by vehicles that they own or lease.[6]

Out-of-state wineries, by contrast, are subject to different regulations.

---

[5] This is a source of dispute between the litigants. Appellants contend that even though the Florida Attorney General believes that the statute does not allow direct delivery by common carriers, DABT interprets the statute in a way that would, in fact, permit delivery by common carriers. We agree with the State that section 561.57 is unambiguous in its requirement of delivery by privately owned or leased vehicles. Moreover, the DABT letter that is the source of the disputed interpretation is not an official opinion and is not binding on the State. There is an administrative process for obtaining an official determination which has not been undertaken. See FLA. STAT. ANN. § 120.565(1).

[6] Whether wineries may ship directly to consumers via privately owned (or leased) vehicles is not altogether clear. Florida distributors and wineries argue that wineries may only sell on their premises, but their brief goes on to assume that off-premises delivery is legal. This confusion is understandable given the ambiguity of the statutes. The statute carves out an exception for wineries, enabling them to obtain vendors' licenses provided that "the licensed premises of the vendor are situated on property contiguous to the manufacturing premises of the licensed manufacturer of wine." FLA. STAT. ANN. § 561.221(1)(a). Arguably, this language was meant cabin wineries to on-site sales only; otherwise, the language would seem devoid of any purpose. The statute does not by its terms, however, provide that sales must be on the winery's premises. Rather, it merely confines those wineries eligible for a vendor's license to those with a sales outlet on contiguous property. It says nothing about additional sales off the premises, so long as contiguous premises are maintained. Since section 561.221 allows wineries to attain vendors' licenses and section 561.57 grants vendors the right to deliver alcohol to consumers (so long as the vendors' vehicles are used), the best reading of the statute is that the winery-turned-vendor, like all other vendors, is allowed to deliver by using its own vehicles. That this is the better reading perhaps explains why the parties mostly debated whether wineries could also deliver by common carrier.

4

Specifically, out-of-state wineries are prohibited from directly delivering their products to consumers, whether by private vehicle or common carrier. FLA. STAT. ANN. § 561.54(1).[7] Violators are potentially subject to treble damages, id. § 561.54(2), and felony prosecution, id. § 561.545(3). The in-state winery, then, can sell on its premises or by delivery using its own vehicles, thus bypassing the intermediaries in the three-tier distribution system and (most importantly) their mark-ups. Out-of-state wineries, on the other hand, cannot avoid this mark-up and are therefore at a competitive disadvantage – so much so that many of them are unable to enter the Florida market, and many wine connoisseurs are unable to attain the wines they desire.[8] This discriminatory scheme, it is alleged, violates the

---

[7] The key substantive provision – section 561.54(1) – provides:

It is unlawful for common or permit carriers, operators of privately owned cars, trucks, buses, or other conveyances or out-of-state manufacturers or suppliers to make delivery from without the state of any alcoholic beverage to any person, association of persons, or corporation within the state, except to qualified manufacturers, distributors, and exporters of such beverages so delivered and to qualified bonded warehouses in this state.

[8] It is unclear whether the remedy appellants seek – an injunction against the enforcement of sections 561.54 and 561.545(1) – would actually remedy the harm from the alleged constitutional violation. If the courts grant the proposed remedy, out-of-state wineries will still be subject to the general requirement of section 561.57 which requires shipment to consumers only via privately owned vehicles and not common carriers. There is no evidence in the record that the out-of-state suppliers in this litigation would actually sell wine to Florida consumers if they had to ship by using vehicles that they own or lease. The Joint Stipulation asserts that *retailers* ship to consumers only by common carrier, but it does not specify how *wineries* ship their product.
We might be inclined to dismiss the case for lack of standing, but the plaintiffs are (perhaps unwittingly) saved by their vague complaint, which states only that "[o]ut-of-state wine suppliers will sell wine to Plaintiffs and deliver it to their residences in Florida if the laws

5

Commerce Clause in a way that cannot be saved by the Twenty-first Amendment.

Below, we shall follow the analytical framework used by the Supreme Court in

Bacchus Imports., Ltd. v. Dias, 468 U.S. 263, 104 S. Ct. 3049, 82 L. Ed. 2d 200

(1984), and subsequent lower courts, see, e.g., Milton S. Kronheim & Co. v. District

of Columbia, 91 F.3d 193 (D.C. Cir. 1996).  First, we scrutinize Florida's statutes

under the Commerce Clause.[9]  Second, we examine whether any violation is saved

by the Twenty-first Amendment.

## II.

## A.

The Commerce Clause states that "Congress shall have Power . . . To regulate

Commerce . . . among the several States . . . ."  U.S. CONST. art. I, § 8, cl. 3.

---

prohibiting such interstate shipments are repealed or declared unconstitutional."  We grudgingly accept this allegation as sufficient to encompass delivery by privately owned vehicles. Therefore, the plaintiffs have demonstrated  injury-in-fact, causation, and redressability in their complaint as required in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).  But this still leaves open whether, on the merits, the remedy appellants seek will make them whole.  Resolution of this issue is for the district court to make in the first instance in formulating the appropriate remedy, if any, to be granted.

[9]The dissent contends that we ought not reach the Commerce Clause issue in light of the State's concession that "absent the effect of the 21st Amendment and/or Webb-Kenyon Act, prohibition of direct shipment (of alcoholic beverages to consumers in interstate commerce) would violate the dormant commerce clause."  As the discussion below should make clear, a generic concession does not eliminate the necessity of a Commerce Clause analysis, because the *type* of Commerce Clause violation determines how the Twenty-first Amendment affects the analysis.  For example, "rank protectionism" can never be saved by the Twenty-first Amendment, whereas other types of violations (such as the violation in this case) potentially can be saved by that Amendment.

6

Although the clause speaks literally only to the powers of Congress, it is well settled that it has a "dormant" aspect as well, namely, one that serves as "a substantive restriction on permissible state regulation of interstate commerce." Dennis v. Higgins, 498 U.S. 439, 447, 111 S. Ct. 865, 870, 112 L. Ed. 2d 969 (1991) (internal quotation marks omitted). "This 'negative' aspect of the Commerce Clause prohibits economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273-74, 108 S. Ct. 1803, 1807, 100 L. Ed. 2d 302 (1988). The clause also works to keep states from "ventur[ing] excessively into the regulation of . . . [interstate] commerce . . . [and] trespass[ing] upon national interests . . . ." Kassel v. Consol. Freightways Corp. of Del., 450 U.S. 662, 669, 101 S. Ct. 1309, 1315, 67 L. Ed. 2d 580 (1981) (internal quotation marks omitted).

To determine whether a statutory scheme violates the dormant Commerce Clause, we employ two tiers of analysis. See Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 578-79, 106 S. Ct. 2080, 2084, 90 L. Ed. 2d 552 (1986). If the scheme "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry." Brown-Forman, 476 U.S. at 579, 106 S. Ct. at 2084. Only if such a

7

regulation is shown to "advance[ ] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives" will it be upheld. Limbach, 486 U.S. at 278, 108 S. Ct. at 1810; see also Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 353, 97 S. Ct. 2434, 2447, 53 L. Ed. 2d 383 (1977). "When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." Brown-Forman, 476 U.S. at 579, 106 S. Ct. at 2084. Though the two tiers of analysis are not clearly distinguishable, "[i]n either situation, the critical consideration is the overall effect of the statute on both local and interstate activity." Id.

B.

Florida's regulatory scheme cannot withstand tier-one scrutiny. The State's argument is confusing because it at once (a) concedes that absent the effect of the Twenty-first Amendment and/or the Webb-Kenyon Act, prohibition of direct shipment would violate the dormant commerce clause, and (b) then goes on to defend the statute as nondiscriminatory. We can sympathize with the State's reluctance to engage in the latter argument, because the district court was certainly correct in finding the law discriminatory on its face.

8

The state argues, "No alcohol can be delivered to a consumer by *common carrier* in Florida regardless of the source of the product. These laws apply to everyone engaged in the business of alcoholic beverages." This is correct, but incomplete, because it fails to note that in-state vendors (and therefore in-state wineries fortunate enough to have a vendor's permit) can deliver alcohol to consumer by using *vehicles that they own or lease*. See part I, supra. Next, the State contends, "No distributor or manufacturer can sell alcoholic beverages to a consumer, and a vendor cannot transport such merchandise to a consumer except in his own or leased vehicle. There is no discrimination involved – everyone is restricted in the same way." This contention is misleading because one cluster of manufacturers – in-state wineries – *can* deliver to consumers via owned or leased vehicle, and therein lies the discrimination. We agree with the district court that the statute discriminates on its face.[10]

Being facially discriminatory, Florida's regulatory scheme violates the

_____

[10] Two other forms of discrimination might be possible. First, an out-of-state winery might allege that even if Florida chose to prohibit direct shipment to consumers across the board, the State would still be discriminating if it were to allow in-state wineries to sell wine on their premises. This is because a similar retail outlet would be unavailable to out-of-state wineries. The statute cannot be construed so narrowly, and thus we have no occasion to decide whether a more narrow Florida law that provides a winery exception only for on-premises sales would violate the Commerce Clause. Second, appellants might allege that the statute is being enforced in a discriminatory fashion, allowing in-state firms to ship via common carrier but not out-of-state firms. Although alluded to during oral argument, this contention was neither alleged in the appellants' complaint, nor discussed in the Joint Stipulation or briefs. Thus, the matter is likewise not before us.

Commerce Clause unless the statute advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.

We agree with the holding below that there are, in fact, nondiscriminatory alternatives. Florida could license and regulate out-of-state wineries that intend to ship to Florida consumers through a licensing process similar to that employed with in-state wineries. See Joint Stipulation, ¶ 22 (noting that other states utilize a permit system for out-of-state liquor producers). This licensing process could also satisfy the State's revenue concerns by requiring out-of-state wineries to collect and remit all applicable taxes. Id. Similarly, the state could address its "diversion" concerns by imposing labeling requirements on wine shipped directly to Florida consumers. Finally, vigorous enforcement of criminal penalties, see FLA. STAT. ANN. §§ 562.11, 562.111, and threats of license revocation could be used to control the sale of alcohol to minors. Because the Florida statutes discriminate against out-of-state retailers and nondiscriminatory alternatives are available to serve the State's interests, Florida's regulatory scheme violates the Commerce Clause.[11]

## C.

The "dormant" aspect of the Commerce Clause arises from a negative inference from the constitutional grant to Congress to regulate commerce. It is

---

[11] Because we conclude that Florida's regulatory scheme flunks tier-one scrutiny, we decline to undertake a tier-two analysis.

10

therefore axiomatic that when Congress acts in a way that grants states permission to burden interstate commerce, the courts may not interfere. The Supreme Court put it this way:

> [W]e only engage in this review when Congress has not acted or purported to act. Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action. Courts are final arbiters under the Commerce Clause only when Congress has not acted.

Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 154-55, 102 S. Ct. 894, 910-11, 71 L. Ed. 2d 21 (1982) (citations omitted). This consent by Congress is sometimes dubbed a "reconveyance" of federal authority. See generally Boris I. Bittker, Bittker on the Regulation of Interstate and Foreign Commerce § 9.02 & n.5 (1999).

The State devotes a substantial portion of its brief to arguing that the Webb-

11

Kenyon Act,[12] 27 U.S.C. § 122, constitutes a reconveyance of authority, enabling states to regulate liquor in a way that is immunized from Commerce Clause scrutiny. The problem with this argument is that the Twenty-first Amendment itself, no less than the Webb-Kenyon Act, could theoretically constitute a reconveyance. But the Supreme Court has not interpreted the Twenty-first Amendment in that fashion, and we decline to so interpret a mere statute passed prior to the Amendment. Put differently, Congress might decide to permit an otherwise unconstitutional burden on interstate commerce in one of two ways, either by ordinary legislation or by an amendment to the Constitution. It would be odd to say that the latter – here, the Twenty-first Amendment – does not immunize states from Commerce Clause scrutiny, but that the former does. The Amendment and the Act must be read congruently. Therefore, in understanding whether the Webb-Kenyon Act constitutes a reconveyance, we must look to see how the Supreme Court has interpreted the Twenty-first Amendment. If the Supreme Court has decided that the Amendment does not constitute a reconveyance, then neither does its statutory counterpart, the Webb-Kenyon Act. As will be discussed in part IV, *infra*, the

---

[12] The Webb-Kenyon Act of 1913, which mirrors the Twenty-first Amendment, prohibits:

> The shipment or transportation . . . of any . . . intoxicating liquor of any kind from one State, Territory, or District . . . into any other State, Territory, or District . . . intended . . . to be received, possessed, sold, or in any manner used . . . in violation of any law of such State, Territory, or District . . . ."

12

Supreme Court has, in fact, held in a number of cases that the Twenty-first Amendment does *not* operate totally to immunize states from Commerce Clause scrutiny.  Therefore, Florida cannot look to the Webb-Kenyon Act for help.

### D.

We are unconvinced by the appellants' argument that Florida's regulatory scheme has impermissible extraterritorial effects under Healy v. Beer Institute, 491 U.S. 324, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989).  In that case, the Supreme Court struck down a Connecticut statute requiring out-of-state brewers to affirm that their posted prices to Connecticut beer wholesalers were no higher than the prices charged to wholesalers in neighboring states.  Florida's direct-shipment laws, by contrast, do not regulate transactions occurring "wholly outside" the state.  Rather, all regulation begins at the state border.

### E.

In sum, we conclude that in the absence of the Twenty-first Amendment, the Florida scheme would violate the dormant Commerce Clause.  This is not because the statute attempts to regulate transactions outside its borders; it does not.  Rather, it is because Florida's law discriminates on its face without meeting the requirement that it advance a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.  Finally, we conclude that the dormant

13

Commerce Clause attack is not shielded by the Webb-Kenyon Act, because that statute cannot be interpreted as a reconveyance of Congress's authority to interfere with interstate commerce. As we discuss below, however, the attack might be shielded by the Twenty-first Amendment if the State can muster sufficient evidence.[13]

### III.

The Twenty-first Amendment has long been a source of confusion in constitutional law. The text of section 2 renders it unconstitutional for anyone to violate state laws governing the importation of intoxicating beverages. That is, it makes an already-illegal action also an unconstitutional action, but does not purport to do anything to the Commerce Clause of Article I. See Laurence H. Tribe, How to Violate the Constitution Without Really Trying: Lessons from the Repeal of Prohibition to the Balanced Budget Amendment, 12 Const. Comment. 217, 219-20 (1995). But if the Amendment in no way alters the dormant Commerce Clause, it would create the anomaly in which an entity (*e.g.,* a liquor distributor) would frequently violate the Constitution by violating unconstitutional state laws.

---

[13] The State's reliance on the Twenty-first Amendment constitutes an affirmative defense within the meaning of Rule 8(c) of the Federal Rules of Civil Procedure, in that from a procedural point of view, the State is treated as seeking to "avoid" the Commerce Clause violation. Rule 8(c) provides in pertinent part: "In pleading to a preceding pleading [here, the appellants' complaint] a party [here, the State] shall set forth . . . any . . . matter constituting an avoidance or affirmative defense."

14

Laurence H. Tribe, <u>American Constitutional Law</u> §1–12, at 35 n.15 (3d ed. 2000).

The Amendment is thus treated as though it permits states to enact some laws

banning the importation of alcoholic beverages even though such laws might,

without the Twenty-first Amendment, violate the dormant Commerce Clause. <u>See,</u>

<u>e.g.</u>, <u>44 Liquormart, Inc.  v. Rhode Island</u>, 517 U.S. 484, 516, 116 S. Ct. 1495, 1514,

134 L. Ed. 2d 711 (1996) ("[T]he Twenty-first Amendment limits the effect of the

dormant Commerce Clause on a State's regulatory power over the delivery or use of

intoxicating beverages within its borders . . . ."). At the same time, the Supreme

Court has also held that the Amendment falls short of giving states free rein in

regulating the importation of alcoholic beverages.  <u>See</u> <u>Healy</u>, 491 U.S. at 341-43,

109 S. Ct. at 2502-03**.**   The doctrine can be restated as follows: the Twenty-first

Amendment alters the dormant Commerce Clause in a way that provides states some

added insulation from an otherwise valid attack, but falls short of full immunization.

Where, in this never-never land between the two extreme poles of irrelevance

and total immunization, does the constitutional rule lie?  The answer holds the key

to this case.  As discussed above, the dormant Commerce Clause doctrine consists

of four principles: (1) laws that directly regulate commerce occurring in other states

are invalid, <u>see, e.g.</u>, <u>Healy</u>, 491 U.S. at 336, 109 S. Ct. at 2499; (2) laws that

amount to "mere economic protectionism" are also invalid, see, e.g., Bacchus Imports, LTD v. Dias, 468 U.S. 263, 276, 104 S. Ct. 3049, 3058, 82 L. Ed. 2d 200 (1984); (3) laws that discriminate on their face are rarely upheld and must be shown to "advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives," New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 278, 108 S. Ct. 1803, 1810, 100 L. Ed. 2d 302 (1988); and (4) when a statute has only indirect effects on interstate commerce and regulates evenhandedly, courts examine whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits, Brown-Forman, 476 U.S. at 579, 106 S. Ct. at 2084. How does the Twenty-first Amendment alter this analysis? Appellants impliedly contend that only the fourth principle is not knocked out. That is, the Twenty-first Amendment may well eliminate the need to engage in balancing when a statute is discriminatory only in effect, but a statute that discriminates on its face remains virtually invalid *per se.* The State, on the other hand, contends that *all* prongs are trumped by the Amendment – save perhaps the ban on laws with extraterritoriality effects (principle one). We disagree with both parties. We think that the following rule represents the best reading of the cases: All components of the dormant Commerce Clause doctrine remain in force unless a "core concern" of the Twenty-first Amendment is implicated. When such a concern is implicated, the

16

Amendment removes the constitutional cloud from the challenged law so long as the

state demonstrates that it genuinely needs the law to effectuate its proffered core

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

concern.  In no event can the law directly regulate extraterritorially, see Healy, 491

U.S. at 336, 109 S. Ct. at 2499; nor can a law ever be motivated by "mere economic

protectionism," see Bacchus, 468 U.S. at 276, 104 S. Ct. at 3058.  In short,

principles three and four are both knocked out, but only when the State makes the

appropriate "core concern" showing.[14]

Our starting point is Bacchus.  There, the Supreme Court struck down a

Hawaii tax on imported liquor.   Drawing from Hostetter v. Idlewild Bon Voyage

Liquor Corp., 377 U.S. 324, 84 S. Ct. 1293, 12 L. Ed. 2d 350 (1964), a preemption-

insulation case, the Supreme Court held:

> It is by now clear that the Amendment did not entirely remove state
> regulation of alcoholic beverages from the ambit of the Commerce Clause.
> . . . The question in this case is thus whether the principles underlying the
> Twenty-first Amendment are sufficiently implicated by the [state tax
> exemption for liquor products manufactured in Hawaii] to outweigh the
> Commerce Clause principles that would otherwise be offended. Or as we
> recently asked in a slightly different way, "whether the interests
> implicated by a state regulation are so closely related to the powers
> reserved by the Twenty-first Amendment that the regulation may prevail,
> notwithstanding that its requirement directly conflicts with express federal

---

[14]    The Supreme Court cases are confusing because many of them implicate different issues and, at the same time, borrow quotations from one another.  The cases can generally be grouped under two headings – those exploring the reach of federal power in light of the Twenty-first Amendment (what we call the "preemption-insulation" aspect of the Amendment) and those exploring the ability of states to burden interstate commerce.  This litigation obviously implicates the latter cases, but it is informed by all of them.

17

polices" (citations omitted).

Bacchus, 468 U.S. at 275-76, 104 S. Ct. at 3057.

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

The Court held that laws constituting mere economic protectionism are "not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor." Bacchus, 468 U.S. at 276, 104 S. Ct. at 3058. Since the state sought only to promote local industry rather than to "justify its tax on the ground that it was designed to promote temperance or to carry out *any other purpose* of the Twenty-first Amendment," the statute was held unconstitutional. Id. (emphasis added). Four important principles can be gleaned from this holding. *First*, statutes closely intertwined with a purpose "closely related" to the Twenty-first Amendment can generally withstand an otherwise fatal attack under the Commerce Clause. *Second*, statutes are not "closely related" if their primary purpose is merely to protect local industry. *Third*, there are "other purposes" of the Twenty-first Amendment besides temperance (although the Court left unanswered what those concerns might be). *Fourth*, it was not sufficient in Bacchus that the challenged statute was *discriminatory*; what was fatal was that it constituted *mere protectionism*. The Court left open one key issue: what are the "purposes" of the Twenty-first Amendment pursuant to which discriminatory state legislation can withstand a Commerce Clause attack?

18

The Supreme Court has left the issue largely unexplained, save for a single sentence in <u>North Dakota v. United States</u>, 495 U.S. 423, 110 S. Ct. 1986, 109 L. Ed. 2d 420 (1990). The plurality opinion in that case is the only word by the Court on what (besides temperance) constitutes a valid state concern under the Twenty-first Amendment. <u>North Dakota</u> was an intergovernmental immunity case (a close cousin of the preemption-insulation case) rather than a Commerce Clause case. At issue was whether North Dakota's reporting and labeling requirements could withstand a constitutional challenge since they interfered with contrary federal interests in selling liquor to military personnel. The Court upheld the statute, asserting that other interests besides temperance, such as ensuring orderly market conditions and raising revenue, are "unquestionably legitimate" under the Twenty-first Amendment. <u>North Dakota</u>, 495 U.S. at 432, 110 S. Ct. at 1993. We find unpersuasive appellants' distinction of the case on the grounds that it did not involve the dormant Commerce Clause. As noted above, the two lines of cases have frequently intersected. For example, <u>Bacchus</u>, like <u>North Dakota</u>, relied heavily on <u>Hostetter</u> (a preemption-insulation case) in coming to its conclusion.[15]

---

[15] Both parties cite to a recent and highly similar Seventh Circuit decision for various propositions, not least of which is the importance of this "core concerns" analysis. <u>See</u> <u>Bridenbaugh v. Freeman-Wilson</u>, 227 F.3d 848 (7th Cir. 2000). We disagree with the analytical framework used in that case and are skeptical of its assessment of the facts. First, the court set forth two legal principles with which we disagree. One of these was the interpretation of section 2 to stand for a pure nondiscrimination principle. <u>Id.</u> at 853 ("[Section 2] enables a state to do to importation of liquor . . . what it chooses to do to internal sales of liquor, but nothing more.").

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

19

This does not mean, however, that the State can prevail without *evidence* supporting a genuine need for its discriminatory laws.[16]  Not only must the State raise a "core concern," but it must also show that its statutory scheme is genuinely needed to effectuate the proffered core concern.[17]  We find inadequate the State's proffered concerns of protecting minors and ensuring orderly markets.  With regard

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

---

As we explained in the text, <u>Bacchus</u> held only that "mere economic protectionism" vitiates the Twenty-first Amendment shield to a dormant Commerce Clause attack.  Since a state can *discriminate* without engaging in *protectionism*, discrimination alone cannot be the touchstone.  <u>Cf.</u> <u>Limbach</u>, 486 U. S. at 278, 108 S. Ct. at 1810 ("[W]hat may appear to be a 'discriminatory' provision in the constitutionally prohibited sense – that is, a protectionist enactment – may on closer analysis not be so.").  Second, the court jettisoned the "core concerns" analysis, stating that "our guide is the text and history of the Constitution," and not "district courts and student notes."  <u>Bridenbaugh</u>, 227 F.3d at 851.  We think, however, that the "core concerns" inquiry was prescribed by the Supreme Court, and we decline to embark on a different path.  We find more persuasive the analytical framework used by the D.C. Circuit in <u>Kronheim</u>, 91 F.3d 193, and by the district court in this case.  Finally, the court made the factual conclusion that there was no discrimination involved.  This conclusion is dubious, because the court clearly noted that "local wineries, but not wineries 'in the business of selling . . . in another state or country [can] ship directly to Indiana consumers."  <u>Bridenbaugh</u>, 227 F.3d at 851.  The court somehow went on to conclude that there was no discrimination since *in-state* permit holders could deliver wines manufactured in other states.   But this does not change the fact that out-of-state wineries were disadvantaged by their inability to deliver to Indiana consumers.  At this point, the court pointed to the fact that the only plaintiffs were Indiana consumers and not out-of-state wineries.  This fact is absent in our case, but we hardly see how it made a difference; consumers were no doubt harmed by the impediment to the inflow of out-of-state wines.  Perhaps the problem was in the pleadings: the plaintiffs in that case, the court held, were "concerned only with direct shipments from out-of-state sellers who *lack and do not want* Indiana permits."  <u>Id.</u> at 854**.**  The plaintiffs in our case, by contrast, want only to be treated the same as their in-state counterparts.

[16]The dissent, as well as the district court, both seem content to let the State prevail so long as it merely asserts an interest that could somehow be characterized as a core concern.  We believe that such mere assertion is not enough; the State, having the burden of proof on the Twenty-first Amendment defense, needs to present evidence of its alleged interest.

[17]This evidentiary standard is far less than the strict scrutiny required under a traditional tier-one analysis of discriminatory laws.  For example, the State need not show that there are no nondiscriminatory alternatives available.

to minors, the State makes the following argument: "The threat of loss of a beverage license because of sale to underage consumers will better ensure that sale and delivery will only be to qualified consumers. The State has the right to decide not to rely on UPS or FedEx drivers to make the proper age determinations before delivering liquor." As we explained in part I, no delivery of alcohol to consumers by common carriers is allowed under Florida law.[18] This rule will not be changed if the direct-shipment laws are struck down; out-of-state firms would simply be able to deliver by using vehicles that they own or lease, just like their in-state rivals. This means that the out-of-state firm can equally be threatened with the loss of a beverage license if it illegally delivers alcohol to minors. As for "ensuring orderly markets," we are not sure what that phrase means, but it certainly does not mean discrimination in a way that effectively forecloses out-of-state firms from the Florida market.

This leaves excise taxes. Like many states, Florida receives significant tax revenue from excise taxes on alcohol pursuant to section 564.06 of the Florida Code.[19] It is true that North Dakota listed the raising of revenue as a legitimate core

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

---

[18]The State agrees with this interpretation of Florida law on page 8 of its brief.

[19]    Total excise taxes on all forms of alcoholic beverages generated $466,364,687 in revenue for 1998-99 and similarly large returns in previous years. See Joint Stipulation, ¶ 28.

21

concern under the Twenty-first Amendment.[20] North Dakota, 495 U.S. at 432, 110 S. Ct. at 1993. We do not think it sufficient, however, for Florida to simply show that (a) taxation is a "core concern" and (b) the three-tier distribution scheme, although discriminatory, promotes its revenue-raising goals. Before the State can successfully raise the Twenty-first Amendment as a shield, it must show that its statutory scheme is necessary to effectuate the proffered core concern in a way that justifies treating out-of-state firms differently from in-state firms – a fact question. Why, exactly, must Florida engage in this discriminatory scheme to effectuate its desire to raise revenue? What is so unique about the geographic location of out-of-state wineries that makes taxing them so difficult that they are forced (unlike their in-state counterparts) into the three-tier distribution system? After all, in-state wineries are taxed directly, and this alternative therefore appears to be a viable substitute to the three-tier taxation scheme.[21] So why can't out-of-state firms be taxed directly, just like in-state wineries?[22] In short, the State has not shown as a matter of law that its

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

_____

[20] There is a strong case to be made that this language was mere dicta by a plurality of the Supreme Court and therefore should not be given significant weight. Because we lack any other guidance from the Court on what the "core concerns" of the Twenty-first Amendment might be, we find North Dakota's enumeration of core concerns persuasive, if not binding.

[21] The parties stipulate that "[f]or wine produced out-of-state, the [excise] tax is generally paid by the wholesale distributor. For wine produced in Florida, the tax is paid by the winery." Joint Stipulation, ¶ 28. This must be inferred from § 564.06, which says that "all manufacturers and distributors" must pay a tax.

[22] Out-of-state wineries are prepared to remit any excise or sales taxes due on wine purchases. See Joint Stipulation, ¶ 15.

regulatory scheme is so closely related to the core concern of raising revenue as to escape Commerce Clause scrutiny. In fact, the Joint Stipulation does not discuss the degree to which Florida's liquor regulations are needed to effectuate its revenue-raising agenda at all.

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK

Because a material issue of fact remains, the judgment of the district court is VACATED and the case REMANDED for further consideration of this single issue.[23]

RONEY, Circuit Judge:

I respectfully dissent. I would affirm the district court's denial of plaintiffs' claim.

First, since the state in its brief has conceded that "absent the effect of the 21st Amendment and/or the Webb-Kenyon Act, prohibition of direct shipment (of alcoholic beverages to consumers in interstate commerce) would violate the dormant commerce clause," I would accept that concession and not decide that stand-alone issue.

Second, I would hold that Florida's direct shipment laws are constitutional under § 2 of the 21st Amendment of the United States Constitution, based upon the reasoning of the district court. *Bainbridge v. Bush*, 148 F. Supp. 2d 1306 (MD Fla 2001).

---

[23] As we observed at note 3, *supra*, the district court denied as moot the renewed motions to intervene filed by four alcoholic beverage trade associations. The associations challenge this ruling in this appeal. Since the motions are no longer moot, we leave to the district court the question whether the associations should be permitted to intervene.

23

In these credit card days of easy purchase by telephone and internet, this statute reflects the "core" concerns of the 21st Amendment that alcoholic beverages not be sold to underage consumers and not be sold effectively unregulated and untaxed. This court improperly treats as equal the prospective loss of a beverage license to an in-state firm and the loss of a Florida beverage license of an out-of-state firm, if one is required at all. One would put the firm out of business, the other would simply restrict the market by a state. Likewise, there is a distinct difference between an in-state firm being able to deliver by a vehicle owned or leased by it, a vehicle presumably registered and licensed by Florida, and an out-of-state firm being able to deliver by out-of-state vehicles which it owns or leases, over which the state of Florida has little control. The jurisdictional barriers to enforcement of Florida's beverage laws against out-of-state firms selling and delivering directly to consumers justifies the constitutionality of the statutes claimants seek to hold unconstitutional.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 4, 2002
THOMAS K. KAHN
CLERK