RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEBAMOFF ENTERPRISES INC.; JOSEPH DOUST; JACK STRIDE; JACK SCHULZ; RICHARD DONOVAN,

> *Plaintiffs-Appellees*,

*v.*

GRETCHEN WHITMER; DANA NESSEL; PAT GAGLIARDI,

> *Defendants-Appellants* (18-2199),

MICHIGAN BEER & WINE WHOLESALERS ASSOCIATION,

> *Intervenor Defendant-Appellant* (18-2200).

Nos. 18-2199/2200

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-10191—Arthur J. Tarnow, District Judge.

Argued: March 12, 2020

Decided and Filed: April 21, 2020

Before: SUTTON, McKEAGUE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mark G. Sands, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for State of Michigan Appellants. Deborah A. Skakel, BLANK ROME LLP, New York, New York, for Intervening Appellants. James A. Tanford, EPSTEIN, COHEN, SEIF & PORTER, LLP, Indianapolis, Indiana, for Appellees. **ON BRIEF:** Mark G. Sands, Melinda A. Leonard, Donald S. McGehee, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for State of Michigan Appellants. Deborah A. Skakel, BLANK ROME LLP, New York, New York, Curtis R. Hadley, Anthony S. Kogut, WILLINGHAM & COTÉ, P.C., East Lansing, Michigan, for Intervening Appellants. James A. Tanford, Robert D. Epstein, EPSTEIN, COHEN, SEIF & PORTER, LLP, Indianapolis, Indiana, for Appellees. John C. Neiman, Jr., MAYNARD COOPER & GALE P.C., Birmingham, Alabama, Sean O'Leary, O'LEARY LAW AND POLICY GROUP, LLC, Elmhurst, Illinois, Deanne E. Maynard,

MORRISON & FOERSTER LLP, Washington, D.C., Scott A. Keller, BAKER BOTTS LLP, Washington, D.C., for Amici Curiae.

SUTTON, J., delivered the opinion of the court in which McKEAGUE and DONALD, JJ., joined. McKEAGUE, J. (pp. 17–20), delivered a separate concurring opinion in which DONALD, J., joined.

————————————

**OPINION**

————————————

SUTTON, Circuit Judge. The parties agree that the Twenty-first Amendment allows Michigan to distribute alcohol within its borders solely through a three-tier system, one composed of producers, wholesalers, and retailers. And the parties agree that Michigan may impose all manner of regulations on its wholesalers (*e.g.*, that they be in the State, adhere to minimum prices, and decline to offer volume discounts) as well as on its retailers (*e.g.*, that they be present in the State, sell only within the State, and comply with health-and-safety rules). What separates the parties is whether Michigan may permit its retailers to offer at-home deliveries within the State while denying the same option to an Indiana retailer who does not have a Michigan retail license. Because the Twenty-first Amendment permits Michigan to treat in-state retailers (who operate within the three-tier system) differently from out-of-state retailers (who do not), we uphold the law.

I.

Some history is in order. Before Prohibition, alcohol producers typically sold their beer and liquor through "tied-house" saloons. They set up saloonkeepers with a building and equipment in exchange for promises to sell only their drinks and to meet minimum sales goals. The system efficiently brought alcohol to market, keeping prices low and choices aplenty. But not all efficient markets are useful markets. You can have too much of a good thing. Excessive alcohol consumption came with costs for individuals and the public—addiction, crime, violence, and family troubles among them. As "absentee owners," the producers in the tied-house system rarely had to come to grips with these costs: They "knew nothing and cared nothing about the community." Raymond B. Fosdick & Albert L. Scott, *Toward Liquor Control* 33 (Ctr. for

Alcohol Policy 2011) (1933).   When this market structure approached its peak, the Supreme Court remarked that "[t]he statistics of every state show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source." *Crowley v. Christensen*, 137 U.S. 86, 91 (1890).

Extreme problems sometimes prompt extreme solutions.   With ratification of the Eighteenth Amendment, the American people chose national prohibition as the way to address these problems.  This experiment solved some problems but generated others.  With ratification of the Twenty-first Amendment, the people brought this thirteen-year trial to a close.  While Prohibition prompted a significant expansion of the federal government's role in law enforcement, *see generally* Lisa McGirr, *The War on Alcohol:  Prohibition and the Rise of the American State* (2015), its demise returned control over alcohol regulation to the States. Section 2 of the Twenty-first Amendment delegates to each State the choice whether to permit sales of alcohol within its borders and, if so, on what terms and in what way.  Some States initially kept a ban on alcohol in place.  Others permitted it through highly regulated markets to prevent the problems associated with tied-house saloons from resurfacing.  To tighten the reins, States developed "three-tier" systems for alcohol distribution. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2463 n.7 (2019).  To this day, most States retain three-tier systems.  Count Michigan as one of them.

In a three-tier system, the State forbids alcohol producers (the first tier) to sell directly to retailers or consumers.  To access the market, producers must sell to wholesalers located within the State (the second tier).  After that, in-state wholesalers sell exclusively to in-state retailers (the third tier), who make final sales to consumers.  To avoid the tied-house system's "absentee owner" problem, businesses at each tier must be independently owned, and no one may operate more than one tier. *See* Mich. Comp. Laws § 436.1603(4), (13).  States also restrict cooperation and joint marketing efforts that have similar effects.

Wholesalers play a key role in three-tier systems.  Typically few in number and often state-owned, they are the in-state path through which all alcohol passes before reaching consumers.  That allows States, if they wish, to control the amount of alcohol sold through price controls, taxation, and other regulations.  Michigan, for example, imposes minimum prices and

prohibits wholesalers from offering volume discounts or selling on credit. *See, e.g.*, *id.* § 436.2013. When it comes to liquor (though not wine and beer), the State is the wholesaler in Michigan. *See id.* § 436.1231.

Michigan is not the strictest State when it comes to alcohol distribution. Take Utah. For all alcoholic products save light beer, the State is the sole importer and main retailer, making it essentially a two-tier system. *See* Utah Code Ann. §§ 32B-2-202, 204, 501; *id.* § 32B-7-202.

Whether in Michigan, Utah, or elsewhere, this is not Adam Smith's idea of an efficient market. Then again, efficiency is not the goal of the Twenty-first Amendment, whether in the form of easy-to-get alcohol or easy-to-pay-for alcohol. The Amendment gave each State the choice whether to allow any alcohol to be sold within its borders, to allow alcohol to be sold through a market heavily regulated by the visible hand of the State, or to allow alcohol to be sold with little regulation at all.

Against this backdrop, Michigan recently amended its Liquor Control Code. The law allows in-state retailers to deliver directly to consumers using state-licensed "third party facilitators" or common carriers like FedEx or UPS. 2016 Mich. Pub. Acts 520, § 203(3), (15).

In response, Lebamoff Enterprises, a wine retailer based in Fort Wayne, Indiana, along with several Michigan wine consumers filed this lawsuit. They allege that the new law violates the Commerce Clause and the Privileges and Immunities Clause. The Michigan Beer & Wine Wholesalers Association intervened as a defendant.

Both sides moved for summary judgment. The court ruled for the claimants. In choosing a remedy for the violation, the court extended delivery rights to out-of-state retailers rather than returning matters to the no-delivery status quo. Michigan obtained a stay pending appeal.

II.

A.

Resolution of this case turns on the accordion-like interplay of two provisions of the United States Constitution. One is the Commerce Clause, which gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Clause

grants Congress power to preempt or permit state laws that interfere with interstate commerce, and it impliedly "prohibits state laws," as determined by the federal courts, "that unduly restrict interstate commerce." *Tenn. Wine & Spirits*, 139 S. Ct. at 2459. Under the implied prohibition, if a state law discriminates against "out-of-state goods or nonresident economic actors," it may survive only if tailored to advance a legitimate state purpose. *Id.* at 2461.

The other provision is the Twenty-first Amendment. While the Commerce Clause grants Congress power to eliminate state laws that discriminate against interstate commerce, the Twenty-first Amendment grants the States the power to regulate commerce with respect to alcohol. Section 2 of the Amendment bars "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. XXI, § 2. The section gives the States broad latitude to regulate the distribution of alcohol within their borders. *See North Dakota v. United States*, 495 U.S. 423, 432–33 (1990) (plurality opinion); *see also id.* at 447–48 (Scalia, J., concurring in the judgment). Indeed, had Congress (as opposed to the people through the ratification process) enacted this exact law, it is doubtful there would be any role for the federal courts to play. When faced with a dormant Commerce Clause challenge to an alcohol regulation, as a result, we apply a "different" test. *Tenn. Wine & Spirits*, 139 S. Ct. at 2474. Rather than skeptical review, we ask whether the law "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.* But if the "predominant effect of the law is protectionism," rather than the promotion of legitimate state interests, the Twenty-first Amendment does not "shield[]" it. *Id.*

At the outset, it's worth acknowledging that case law authorizes several features of Michigan's system for regulating the distribution of alcohol within its borders.

The courts have frequently said that the Twenty-first Amendment permits a three-tier system of alcohol distribution, and the Commerce Clause does not impliedly prohibit it. Nothing stops States, the Court has explained, from "funnel[ing] sales through the three-tier system," a practice that is "unquestionably legitimate." *Granholm v. Heald*, 544 U.S. 460, 489 (2005) (quotation omitted); *see Tenn. Wine & Spirits*, 139 S. Ct. at 2471–72; *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980). *Granholm*, a case from Michigan, left

no drama about the issue: "States can mandate a three-tier distribution scheme in the exercise of their authority under the Twenty-first Amendment." 544 U.S. at 466. We have echoed the point: A State's "decision to adhere to a three-tier distribution system is immune from direct challenge on Commerce Clause grounds." *Jelovsek v. Bredesen*, 545 F.3d 431, 436 (6th Cir. 2008); *see Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 616, 623 (6th Cir. 2018).

The courts also have permitted States to regulate wholesalers (the second tier) as a way to control the volume of alcohol sold in a State and the terms on which it is sold. *See North Dakota*, 495 U.S. at 432–33 (plurality opinion); *see also id.* at 447–48 (Scalia, J., concurring in the judgment); *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 853–54 (7th Cir. 2000); *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 810–11 (8th Cir. 2013). The Michigan system shows how this works. The State is *the* wholesaler for liquor, and it sells at an inflated price through state-authorized distribution agents. *See* Mich. Comp. Laws §§ 436.1231, 1233. As for private wholesalers of beer and wine, Michigan imposes many restrictions: minimum prices, no sales on credit, no volume discounts. *See id.* §§ 436.2013, 1609a(5); Mich. Admin. Code R. 436.1726(4). The State also regulates retail prices indirectly. It heavily taxes wholesalers, prohibits consignment sales, and restricts the terms on which wholesalers may buy from producers. *See* Mich. Comp. Laws §§ 436.1301, 1409(2). To avoid the "tied-house" problem, Michigan prohibits wholesalers from giving anything of value to retailers, and it prohibits them from having a financial interest in any producer, retailer, or other wholesaler. *See id.* § 436.1603; Mich. Admin. Code R. 436.1651(3), 1735. To enforce these rules, Michigan requires wholesalers to post and hold their prices (to ensure uniformity across retailers and compliance with the pricing restrictions) and to keep records of all sales ready for random inspection. Mich. Admin. Code R. 436.1726.

The federal courts also have permitted States, like Michigan, to require retailers to be physically based in the State. *Byrd*, 883 F.3d at 622–623 & n.8; *Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 743 (5th Cir. 2016). The Michigan licensing process for retailers ensures no violations of "tied-house" rules and no suspect sources of capital. To ensure compliance with its many regulations, the Commission conducts random inspections, over 18,000 in 2016 alone, and sting operations. Retailers also must comply with rules governing

their physical layout, storage of alcohol, recordkeeping, advertisements, and employee training. Mich. Admin. Code R. 436.1007, 1023, 1025, 1309–25, 1501–33.

## B.

All of this leaves a narrow question. If Michigan may have a three-tier system that requires all alcohol sales to run through its in-state wholesalers, and if it may require retailers to locate within the State, may it limit the delivery options created by the new law to in-state retailers? The answer is yes.

"[A]ny notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). That is not clear when it comes to a comparison between Michigan retailers and Indiana retailers like Lebamoff. True, they both sell the same product to consumers. True also, retailers in Northern Indiana and Southern Michigan presumably compete with each other for those consumers. But they operate in distinct regulatory environments, the most notable distinction being that Michigan-based retailers may purchase only from Michigan wholesalers and must operate within its three-tier system and comply with its other regulations. That may affect whether the kind of discrimination targeted by the dormant Commerce Clause is afoot. *See Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 820 (5th Cir. 2010) (upholding a similar statute on this ground). But we need not decide the case on this basis.

Even if Indiana and Michigan retailers count as similarly situated under the dormant Commerce Clause, Lebamoff's claim overlooks the restless specter of the Twenty-first Amendment. Due to the Amendment, Commerce Clause challenges to alcohol regulation face a "different" test. *Tenn. Wine & Spirits*, 139 S. Ct. at 2474. We ask only whether the law "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.*

Michigan's law promotes plenty of legitimate state interests, and any limits on a free market of alcohol distribution flow from the kinds of traditional regulations that characterize this market, not state protectionism. The States, the Court has explained, have legitimate interests in "promoting temperance and controlling the distribution of [alcohol]." *North Dakota*, 495 U.S. at

433, 438–39 (plurality opinion); *see id.* at 447–48 (Scalia, J., concurring in the judgment); *Granholm*, 544 U.S. at 484; *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 276 (1984); *cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504–07 (1996). To promote these interests, States have "virtually complete control over whether to permit importation or sale of liquor and how to structure the[ir] liquor distribution system[s]." *Granholm*, 544 U.S. at 488; *see North Dakota*, 495 U.S. at 424 (plurality opinion); *Midcal Aluminum*, 445 U.S. at 110.

Consistent with these decisions, several lower courts have permitted the States to prohibit out-of-state direct deliveries as a valid exercise of their Twenty-first Amendment authority.

The Seventh Circuit got the ball rolling. In an opinion by Judge Easterbrook, the court upheld an Indiana statute that prohibited direct alcohol deliveries from out of state but allowed in-state retailers and wholesalers to "deliver directly to consumers' homes." *Bridenbaugh*, 227 F.3d at 853–854. The Twenty-first Amendment, he explained, necessarily authorizes *some* discrimination, as any regulation of the "transportation or importation into any state," U.S. Const. amend. XXI, § 2, necessarily protects local sellers by "leav[ing] intrastate commerce unaffected," *Bridenbaugh*, 227 F.3d at 853. And the Amendment's historical backdrop confirms that, at the very least, it authorized bans on direct deliveries from out of state. *Id.* at 851–53. All in all, the court concluded, Indiana's delivery ban was not functionally discriminatory at all. It simply "channel[ed]" all alcohol, from within the State and outside of it, through in-state distributors to facilitate state taxation and regulation, "precisely" what the Twenty-first Amendment was for. *Id.* at 854. In view of the Seventh Circuit's decision to uphold the Indiana law, consider the inequities that would arise if we invalidated the Michigan law. It would mean that Indiana retailers could make direct deliveries within Michigan, but Michigan retailers could not do the same in Indiana. That's no way to run a railroad—or manage cross-border trade.

The Second Circuit upheld a similar law. It permitted in-state retailers to deliver to customers' homes (through their own vehicles or trucking companies) but barred out-of-state retailers from doing the same. *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 187, 191 (2d Cir. 2009). Banning direct deliveries from out-of-state, the court reasoned, was necessary to ensure "all liquor sold within" the state passed through in-state wholesalers. *Id.* at 186. And state control of the wholesalers, it added, promoted "core" Twenty-first Amendment interests by

"promoting temperance [and] ensuring orderly market conditions." *Id.* at 188, 191 (quotation omitted). The court rejected the claim that the law amounted to a cover for economic protectionism and held that *Granholm* confirmed its validity. *Id.* at 191.

The Fifth Circuit upheld a Texas statute that allowed local delivery by in-state retailers but prohibited deliveries from outside the State. *Steen*, 612 F.3d at 812. It upheld the law for much the same reasons as the courts that went before it: Differential treatment of out-of-state deliveries was necessary to preserve the three-tier system and the regulatory objectives it served. *Id.* at 819–20. Nor did in-state delivery privileges undermine this rationale. Like "carry[ing] the beverages to a customer's vehicle parked in [a retailer's] lot, or across the street," in-state deliveries were a "a constitutionally benign incident" of a three-tier a system. *Id.* at 819, 820.

As these opinions suggest, there is nothing unusual about the three-tier system, about prohibiting direct deliveries from out of state to avoid it, or about allowing in-state retailers to deliver alcohol within the State. Opening up the State to direct deliveries from out-of-state retailers necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all. *See Arnold's Wines*, 571 F.3d at 185 n.3. That effectively eliminates the role of Michigan's wholesalers. If successful, Lebamoff's challenge would create a sizeable hole in the three-tier system. Michigan imposes heavy taxes on all alcohol products at the wholesale level. Mich. Comp. Laws § 436.1233(1). And the State itself is the wholesaler for all liquor products, prompting higher prices than a free market would bear. *Id.* That leaves too much room for out-of-state retailers to undercut local prices and to escape the State's interests in limiting consumption.

There's ample reason to think Indiana retailers like Lebamoff would do just that. While Michigan and Indiana both have three-tier systems, they regulate them differently. Unlike Michigan, Indiana permits wholesalers to sell to retailers below cost, with volume discounts, on credit, and with no minimum prices. *See id.* § 436.1609a(5); Mich. Admin. Code R. 436.1055. Nor would it end there. Lebamoff itself identifies close to 2,000 retailers who could use direct deliveries if allowed. That is just the beginning. Once out-of-state delivery opens, the least regulated (and thus the cheapest) alcohol will win. That's good news for people who like a drink or two. But it's not great news for the people responsible for dealing with those

who have trouble stopping. In the absence of delivery restrictions, there is a "substantial" risk that out-of-state alcohol will get "diver[ted] into the retail market[,] . . . disrupti[ng] the [alcohol] distribution system" and increasing alcohol consumption. *North Dakota*, 495 U.S. at 433 (plurality opinion).

The alert reader may wonder if Michigan can respond to this problem by controlling prices set by out-of-state wholesalers and producers. No, it may not. The extraterritoriality doctrine, also rooted in the dormant Commerce Clause, bars state laws that have the "practical effect" of controlling commerce outside their borders. *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 377 (6th Cir. 2013) (Sutton, J., concurring). Although Michigan may regulate the business relationship and prices between *in-state* wholesalers and retailers, it may not do the same for *out-of-state* wholesalers and retailers. *See Healy*, 491 U.S. at 337–38.

That Michigan permits direct deliveries by in-state retailers does not alter this conclusion. These retailers all live with the bitter and sweet of Michigan's three-tier system—the bitter of being able to buy only from Michigan wholesalers (and the price and volume regulations that go with it) and the sweet of being subject only to intrastate competition. Permitting these retailers to deliver directly to consumers is nothing new. Michigan has long allowed retailers to use third-party delivery to serve customers who live in areas "surrounded by water and inaccessible by motor vehicle." Mich. Comp. Laws § 436.1203(13); 2008 Mich. Pub. Acts 474, § 203(12). More recently, Michigan has allowed retailers to deliver alcohol using their own employees. Mich. Comp. Laws § 436.1203(14). One could imagine other examples—say, permitting retailer's employees to bring the customers' goods to their cars or permitting drive-through liquor stores. New delivery options are simply new ways of allowing the heavily regulated third tier to do business. Anyone who wishes to join them can get a Michigan license and face the regulations that come with it. Lebamoff seizes the sweet and wants to take a pass on the bitter.

The text and history of the Twenty-first Amendment support this conclusion. Recall that the text grants the States authority over the "importation" of alcohol into their borders. U.S. Const. amend. XXI, § 2. This suggests state power is "at its apex" when regulating importation, as the challenged Michigan statute does. *See Tenn. Wine & Spirits*, 139 S. Ct. at

2471.  The historical backdrop confirms as much.  Section 2's text tracks the pre-Prohibition Webb-Kenyon Act, "suggest[ing] that § 2 was meant to have a similar meaning."  *Id.* at 2467.  The Webb-Kenyon Act "fix[ed] [a] hole" in state regulatory authority that permitted out-of-state producers to evade state regulations by delivering directly to state residents.  *Id.* at 2466.  Lebamoff's lawsuit is nothing less than an effort to re-create that hole.  Allowing States to "channel" alcohol sales through in-state wholesalers is "precisely what § 2 is for."  *Bridenbaugh*, 227 F.3d at 854.

## C.

Lebamoff challenges this conclusion in several ways, each unconvincing.  It argues that ordinary dormant Commerce Clause analysis applies (false) and that the Twenty-first Amendment is not a complete defense (true).  What the Twenty-first Amendment purports to give, it is true, the dormant Commerce Clause sometimes takes away.  To respect the States' authority to regulate "importation" slights the dormant Commerce Clause's efforts to halt barriers to free commerce.  There is no way around the problem.  "[E]very statute limiting importation leaves intrastate commerce unaffected.  If that were the sort of discrimination that lies outside state power, then § 2 would be a dead letter."  *Id.* at 853.  That's why a "different" dormant Commerce Clause test applies to alcohol regulations.  *Tenn. Wine & Spirits*, 139 S. Ct. at 2474.  The Twenty-first Amendment "gives the States regulatory authority that they would not otherwise enjoy."  *Id.*

Lebamoff tries to minimize the State's interest in preserving a three-tier system, criticizing the costs it imposes.  But Michigan could not maintain a three-tier system, and the public-health interests the system promotes, without barring direct deliveries from outside its borders.  No amount of additional money through spending appropriations or "rais[ed] license fees," Appellee Br. 28, could change that reality.

Lebamoff is skeptical of other potential justifications for Michigan's law:  preventing sales to minors, facilitating tax collection, and ensuring safe products.  *Granholm* rejected many of these justifications in the context of direct-delivery restrictions, it is true.  544 U.S. at 491–92.  There is room for skepticism, we agree, over whether Michigan's delivery restrictions prevent

sales to minors in any material way. Concurring Op. at 3. But even if Michigan could protect minors and ensure retailer accountability in other ways, there is no other way it could preserve the regulatory control provided by the three-tier system.

*Granholm*'s holding does not change this calculus. It concerned a discriminatory *exception* to a three-tier system. *Granholm*, 544 U.S. at 466. In-state wineries could avoid in-state wholesalers and retailers and thus deliver directly to consumers, while out-of-state wineries could not. That was the "explicit discrimination" in *Granholm*, not delivery privileges by themselves. *Id.* at 467. Lower courts have characterized *Granholm* in exactly this way and rejected challenges like Lebamoff's. *See, e.g.*, *Arnold's Wines*, 571 F.3d at 190–91 (upholding state law that permitted in-state, but not out-of-state, retailers to deliver alcohol to consumers' homes); *Steen*, 612 F.3d at 818–19 (same). There is no appellate decision to the contrary.

Lebamoff suggests that a state senator's statement conveys a discriminatory motive. Here is the statement: "[Michigan retailers] currently cannot [deliver wine] legally. And they are under tremendous disadvantage, competitive disadvantage, with out-of-state entities that are doing it illegally right now. So this is a bill to help out our constituents, our local businesses to be more competitive in the marketplace." Dec. 8, 2016, MacGregor Statement on S.B. 1088 at 40:50–41:16, https://www.house.mi.gov/SharedVideo/PlayVideoArchive.html?video=COMM-120816.mp4. As the senator said elsewhere, however, the amendment's purpose was not to give Michigan businesses an advantage but to "level[] the playing field." *Id.* at 40:15. Even if one legislator's voice offered a meaningful insight into a collective body's objectives (doubtful), the statement in context shows only the legitimate goal of evening the playing field.

Nor does Michigan's past treatment of direct deliveries upset this conclusion. Before the 2017 amendment, Michigan permitted out-of-state retailers to deliver alcohol using *their own* vehicles and employees. 2008 Mich. Pub. Acts 474, § 203(11). Even that narrow exception was adopted grudgingly. Michigan originally had a scheme much like the present one: prohibiting out-of-state deliveries and permitting in-state retailers to make them in limited circumstances. But a federal district court, purportedly relying on *Granholm*, found that scheme violated the dormant Commerce Clause. *Siesta Vill. Mkt., LLC v. Granholm*, 596 F. Supp. 2d 1035, 1037–38 (E.D. Mich. 2008). Rather than test this conclusion on appeal, Michigan amended the law,

ending all direct deliveries and permitting a generally-applicable employee-delivery exception. 2008 Mich. Pub. Acts 474, § 203(11). About a decade later, concerned with increasing problems related to cross-border deliveries and reassured by a growing lower court consensus, *see Arnold's Wines, Inc.*, 571 F.3d at 190–91; *Steen*, 612 F.3d at 818–19, Michigan enacted the 2017 amendment. There's nothing wrong with that.

What of the consumer plaintiffs, the Michigan wine purchasers who cannot buy the types of wine they want without inconvenience? The record for one suggests these concerns may be exaggerated. Wine wholesalers have their own profit incentive to carry enough brands to meet consumer demand and answer requests for more. And wine consumers have yet another avenue: the more than 1,200 wineries excepted from the law as long as they make no more than a minimal volume of direct deliveries. Perhaps for these reasons, there are over 44,000 brands of wine available in Michigan, the vast majority of them from out-of-state producers. To be sure, some brands are not available. But the extent of the State's responsibility for that gap is not clear. Some winemakers may seek higher margins by selling exclusively at "high-end" restaurants or at their own vineyards, and others may lack the capacity to produce enough wine for wide distribution. R. 34-3 at 3–5. As Lebamoff's expert admits, fewer than 50,000 of the roughly 200,000 wines sold in the country are available nationwide. That's not Michigan's fault.

Even so, it's likely the case that some wine producers do not sell to Michigan wholesalers due to these regulatory costs. Some rare wines, for example, apparently are available only through specialty retailers located primarily in California, New York, New Jersey, and Chicago. Concurring Op. at 1. But some reduction in consumer choice, it seems to us, flows ineluctably from a three-tier system. The purpose of the system, for better or worse, is to make it harder to sell alcohol by requiring it to pass through regulated in-state wholesalers. Those middlemen unsurprisingly impose added costs, sometimes choice-limiting costs. Still, it's worth noting that Michigan has loosened some regulations to increase choice. That was the point of allowing limited direct deliveries by out-of-state wine producers. Perhaps more amendments are in order. Broadening product options seems far afield from the tied-saloon system that the three-tier system was designed to replace. The internet has widened that gap. Today "[w]e live in a global economy and we shop in virtual marketplaces for everything from luxuries to necessities." *Id.* at

2.  But the Twenty-first Amendment leaves these considerations to the people of Michigan, not to federal judges.

D.

Also unavailing is Lebamoff's claim that the law violates the Privileges and Immunities Clause of Article IV of the United States Constitution.  "The Citizens of each State," the Clause says, "shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const., art. IV, § 2, cl. 1.  The point of the Clause is to "plac[e] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned."  *McBurney v. Young*, 569 U.S. 221, 228 (2013) (quotation omitted).

Long ago, the Court rejected the idea that the right to sell alcohol was a privilege or immunity under the similarly-worded Fourteenth Amendment.  U.S. Const. amend. XIV, § 1, cl. 2.  "There is no inherent right in a citizen to thus sell intoxicating liquors by retail.  It is not a privilege of a citizen of the state or of a citizen of the United States."  *Crowley*, 137 U.S. at 91; *see Mugler v. Kansas*, 123 U.S. 623, 657, 675 (1887); *Bartemeyer v. Iowa*, 85 U.S. (18 Wall.) 129, 132, 135 (1874).  The words of the Twenty-first Amendment, ratified long after 1868, show that a State may prohibit sales of alcohol if it wishes.

On top of that, the Clause concerns discrimination based on state citizenship or residency, *see McBurney*, 569 U.S. at 228, and Michigan's law does not discriminate on that basis.  Residents of Indiana are on "the same footing" as residents of Michigan.  *Id.*  To sell alcohol in Michigan, they simply have to play by the Michigan rules—just as they have to do in Indiana.  So far, over 1,800 non-residents have gotten Michigan retail licenses.  Lebamoff can do the same.  There is no residency requirement, only the requirement that it set up a store within the State—a physical presence requirement that the U.S. Supreme Court and our court permit.  *See Tenn. Wine & Spirits*, 139 S. Ct. at 2475; *Byrd*, 883 F.3d at 622–623 & n.8.

Lebamoff offers no good reason to depart from these principles or to treat this claim in a different way from the dormant Commerce Clause claim.  To its credit, Lebamoff admits that

"[n]o prior case in this or any other circuit" has found a state regulation of alcohol violated the Privileges and Immunities Clause. Appellee Br. 54. We see no good reason to be the first.

III.

Even if the district court had been right in deciding that the law violated the dormant Commerce Clause, it bears adding, the court chose the wrong remedy. Rather than altering Michigan's alcohol distribution system by extending delivery rights to out-of-state retailers, it should have returned things to the pre-2017 status quo.

At stake was whether to invalidate a new law or extend the prior law's reach. In answering that question, we ask what the legislature would have preferred had it known of the constitutional problem, *see Murphy v. NCAA*, 138 S. Ct. 1461, 1482 (2018), doing our best to "limit the solution to the problem," *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006). The imperative is not to "rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole." *Murphy*, 138 S. Ct. at 1482 (quotation omitted).

Look no further than the text of this law for guidance. "If any provision of this act is found to be unconstitutional," it says, "the offending provision shall be severed and shall not affect the remaining portions of the act." Mich. Comp. Laws § 436.1925. The 2017 amendment created the alleged discrimination by granting delivery privileges only to in-state retailers. The severability clause in no uncertain terms says that we should invalidate that provision and leave the rest of the statute—and the rest of the three-tier system—intact.

Another clue points in the same direction. A statutory purpose of the provision at issue, § 436.1203, is to "maintain strong, stable, and effective regulation by having beer and wine sold by retailers consumed in this state [] pass[] through the 3-tier distribution system established under this act." *Id.* § 436.1203(2)(b). How could obliterating that system be consistent with this provision? Any other approach amounts to wholesale surgery, not statutory interpretation.

The district court's solution was to strike the amendment *and* parts of the original statute. The court held the 2017 amendment unconstitutional "insofar as" it precluded direct delivery "in conjunction with [Mich. Comp. Laws] Section 436.1607." R. 43 at 20. Section 1607 provides that only in-state retailers can get delivery licenses, and it was not part of the 2017 amendment. It was enacted over a decade earlier. *See* 2008 Mich. Pub. Acts 218, § 607(1). The court had no basis for touching § 1607 in view of the severability clause.

Some cases, it is true, suggest courts may remedy discrimination by extending benefits rather than retracting them. *See, e.g.*, *Heckler v. Matthews*, 465 U.S. 728, 733 (1984); *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 435 (6th Cir. 2008). But that is a rule of thumb for approximating the "touchstone" of the severability question: legislative intent as captured by the words of the statute. *Ayotte*, 546 U.S. at 330. Today's severability clause clearly conveys the Michigan legislature's intent, and it distinguishes our case from the one on which Lebamoff most heavily leans: *Cherry Hill*, 553 F.3d at 435. Another of Lebamoff's supposedly favorable cases notes the imperative of following "the intent of the legislature" by "consider[ing] the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation." *Heckler*, 465 U.S. at 739 n.5 (quotation omitted). The district court's two-paragraph analysis on this score reveals no consideration or appreciation of that disruption.

We reverse and remand for proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

McKEAGUE, Circuit Judge, concurring.

I ultimately agree that Michigan has presented enough evidence, which the plaintiffs have not sufficiently refuted, to show its in-state retailer requirement serves the public health. *Tennessee Wine and Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2474 (2019).

However, what I believe is the crux of this case is the online shipping component. That Michigan prohibits out-of-state retailers from selling wine online and shipping directly to consumers—but permits wineries and in-state retailers to do so—adds two distinct wrinkles into an otherwise protected three-tier system. First, it asks us to conduct a reexamination of regulations that impede internet commerce generally, given the "'far-reaching systemic and structural changes in the economy' and 'many other societal dimensions' caused by the Cyber Age." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018) (quoting *Direct Mktg. Ass'n v. Brohl*, 135 S. Ct. 1124, 1135 (2015) (Kennedy, J., concurring)). Second, it weakens the public health justifications—thus strengthening the dormant Commerce Clause challenge in this case—but not enough to change the result.

Let's look at it from the perspective of a consumer. The Michigan consumers in this appeal all have varying reasons for buying wine online. Some purchase wine online due to time restraints. Others purchase wine online because the wine they desire is available only online. This is especially true when it comes to imported wine. For example, from 2012 to 2016, 511,437 different wines were approved for sale in the United States. Of those, 65% were of imported origin. And while consumers in most states, including Michigan, may purchase wine directly from wineries across the country, imported wine may only be purchased from retailers within their state and may not be shipped directly from the producer located out of the country or from retailers located outside the state of Michigan. Unsurprisingly, a number of specialty wines are housed only at specialty retailers located primarily in California, New York, New Jersey, and Chicago. So, as evidenced, there's a market for buying wine online, especially from retailers.

But Michigan allows only in-state retailers access to this online market. Only in-state retailers that hold a specially designated merchant license may ship wine directly to consumers. Mich. Comp. Laws § 436.1203(3), (15).

A consumer looking to buy wine for a special occasion can go online, research different varieties of wine, read reviews from aficionados, and select a bottle or two for purchase, only to be told at checkout: "Sorry, you live in Michigan." What a frustration that must be considering this is how we all buy things nowadays. We live in a global economy and we shop in virtual marketplaces for everything from luxuries to necessities. And we now rely even more on online shopping in the recent pandemic.

Obviously, this case involves wine and therefore the Twenty First Amendment complicates things. But does that mean a state's regulation of virtual marketplaces for wine should be seen as simply an extension of its existing three-tier scheme, or as an exception to the scheme warranting judicial rethinking? In some ways, as the lead opinion notes, in-state online sales are analogous to brick-and-mortar wine merchants carrying cases of wine to customers' cars. *See also Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 820 (5th Cir. 2010) (viewing "local deliveries as a constitutionally benign incident of an acceptable three-tier system"). But that analogy loses force when viewed in context of the ubiquity of online sales. Michigan's direct retailer-to-consumer shipping law isn't just a "local delivery." It allows for wide range shipping, even through use of a simple "mobile application." Mich. Comp. Laws § 436.1203(15). It's a whole new market; a market that early twentieth century state legislatures didn't anticipate when crafting the three-tier systems the Supreme Court has since approved. So I'm not so sure that the in-state retailer requirement is just a coda to Michigan's three-tier regulations. A state that opens up direct online shipping to consumers presents the "changing economic and social" circumstances that may call for a different balance between the dormant Commerce Clause and the Twenty First Amendment. *Steen*, 612 F.3d at 819 (citing *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 198–201 (2d Cir. 2009) (Calabresi, J., concurring)). But until a different balance is struck, we are bound by the Supreme Court's protection of a traditional three-tier system.

And with the existing balance now, Michigan's position prevails. Michigan's amendment permitting only in-state retailers to ship directly to consumers must have a public health justification on its own. Because Michigan chose to allow in-state retailers to ship wine directly to consumers, it "must do so on evenhanded terms." *Granholm*, 544 U.S. at 493. If not evenhanded, Michigan must present sufficient evidence to show a public health justification. *Id.*; *Tennessee Wine*, 139 S. Ct. at 2474.

While the online shipping component of Michigan's regulations weakens its public health rationales, Michigan can still show that the in-state retailer requirement protects public health. But to their credit, the plaintiffs offer persuasive counterarguments.

Start with the flaws in Michigan's public health rationales. Take for example Michigan's argument that the in-state requirement allows it to monitor the sale of alcohol to underage individuals. Michigan argues that in the five years before the conclusion of discovery in this case, there had been 3,125 violations for sales to minors uncovered by sting operations involving a minor decoy. Opening up online sales to out-of-state retailers, the argument goes, would make a bad situation worse.

But the fact that in-state retailers can sell online cuts against this rationale. If Michigan thinks there is such a risk of underage sales in the state, why expand that risk by allowing online sales? True, the common carrier delivering alcohol to the consumer's door must be licensed by Michigan and check the consumer's identification and age at the time of delivery. Mich. Comp. Laws § 436.1203(3), (15). For this to happen, though, it's not necessary that the retailer be in-state. Michigan has already proven that. Out-of-state wineries can ship directly to consumers, and Michigan requires consumer identification and age verification. *Id.* § 436.1203(4). So Michigan's shot itself in the foot. Its own evidence tends to show "nondiscriminatory alternatives" could sufficiently further its interests. *Tennessee Wine*, 139 S. Ct. at 2474.

However, in the end, Michigan prevails in its justifications. The tricky part is that Michigan can largely rely on what has already been found to inherently protect public health. For example, requiring retailers to be in-state to sell online allows Michigan to "monitor the stores' operations through on-site inspections." *Tennessee Wine*, 139 S. Ct. at 2475.

For retailers that don't comply with the law, this allows Michigan to revoke licenses (and even recall all products), and this has already been found to "provide[] strong incentives not to sell alcohol in a way that threatens public health or safety." *Id.* (citing *Granholm*, 544 U.S. at 490) (internal quotation marks omitted). In 2016, Michigan conducted 18,039 on-site physical inspections and related contacts at retail establishments for licensing and enforcement purposes. And these inspections "routinely uncover evidence of violations of the Code and administrative rules." Moreover, whether online sales are an extension to traditional three-tier systems or not (which, again, I question), there are the other baked-in public health justifications that flow from such systems, like promoting temperance. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 276 (1984). The plaintiffs here have not produced sufficient countervailing evidence showing that these public health concerns are "mere speculation" or "unsupported assertions," or that the "predominant effect" of the in-state retailer requirement is not the protection of public health. *Tennessee Wine*, 139 S. Ct. at 2474.

With these reservations, I concur.